# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

_____

No. 17-11113

_____

United States Court of Appeals
Fifth Circuit

**FILED**

October 29, 2018

Lyle W. Cayce
Clerk

In the Matter of: PROVIDER MEDS, L.L.C.,

Debtor

RPD HOLDINGS, L.L.C.,

Appellant

v.

TECH PHARMACY SERVICES, doing business as Advanced Pharmacy Services,

Appellee

_____

Appeal from the United States District Court
for the Northern District of Texas

_____

Before HIGGINBOTHAM, SMITH, and GRAVES, Circuit Judges.

PATRICK E. HIGGINBOTHAM, Circuit Judge:

RPD Holdings, L.L.C. claims that it purchased a patent license from multiple debtors in bankruptcy sales of their estates. Tech Pharmacy Services argues that RPD does not have rights under the license to Tech Pharm's patented invention. Concluding that the patent license was a rejected executory contract and could not have been transferred by the bankruptcy sales in question, we agree with Tech Pharm and affirm the decision of the district court.

No. 17-11113

**I**

This appeal emerges from a series of bankruptcy cases involving "OnSite." The entities involved in operating OnSite, the "OnSite parties," placed dispensing machines with long-term care facilities, then used proprietary OnSite software to remotely dispense pharmaceuticals from the machines to nurses in the facilities. They had a joint corporate parent, OnSiteRx, but functioned as independent business entities[1]—and, when the time came to file for bankruptcy, filed separate bankruptcy cases.

**A**

The story begins before the OnSite parties filed for bankruptcy. Tech Pharm holds a patent on a system, software, and related methods of remote pharmaceutical dispensing.[2] In 2010, it sued multiple defendants in the Eastern District of Texas—including several OnSite parties—for infringing this patent by using their own remote pharmaceutical dispensing machines.[3] The OnSite parties counterclaimed challenging Tech Pharm's patent. The parties agreed to settle the litigation, entering into a "Compromise, Settlement, Release, and License Agreement" (the "License Agreement"), granting a "non-exclusive perpetual license" to all but one of the OnSite parties for "so long as the Patent or Patents are valid and enforceable." The OnSite parties agreed to pay a one-time licensing fee of $4,000 for each OnSite machine placed into operation after the execution of the agreement, and to provide quarterly reports reflecting all new machines placed in service. All parties also agreed to release any and all claims they "may have or claim to have . . . which relate to or could have been claimed in the Litigation, or that

---

[1] *See CERx Pharm. Partners, LP v. RPD Holdings, LLC*, No. 13-30678-BJH, 2014 WL 4162870, at *3 (Bankr. N.D. Tex. Aug. 20, 2014).

[2] U.S. Patent No. 7,698,019 (filed Sept. 20, 2004).

[3] Tech Pharm included other, non-OnSite defendants in the same suit, but their involvement is not relevant to this case.

## No. 17-11113

relate to the [Patents] or any alleged infringement [or invalidity] of same, except for the obligations specifically called for under this Agreement." Following the settlement agreement, the district judge in the Eastern District of Texas dismissed all claims with prejudice.

### B

Beginning in 2012 and continuing into 2013, the six OnSite parties relevant to this appeal filed separate Chapter 11 bankruptcy cases in the Northern District of Texas.[4] Each case was later converted to Chapter 7. Five of the six OnSite debtors were also parties to the Tech Pharm License Agreement. Despite the bankruptcy requirement that they schedule all assets and creditors, however, none of the debtors listed the License Agreement or Tech Pharm on their schedules.

RPD had a security interest in the OnSite debtors' collateral. It agreed to purchase its collateral from three of the bankruptcy estates—ProvideRx of Grapevine, LLC ("Grapevine"), ProvideRx of Waco, LLC ("Waco"), and W. Pa. OnSiteRx, LLC ("Western Pennsylvania")—instead of litigating its liens. RPD and each estate laid out the terms of each sale in a separate asset purchase agreement, the APA, and each sale was approved by the bankruptcy court in a separate sale order. No APA explicitly referenced the License; instead, each APA covered certain categories of subject property. In turn, the sale orders approved the sale of the subject property in each APA—providing that to the extent that any of the subject property was an executory contract, it was "hereby ASSUMED by the Estate and immediately ASSIGNED to RPD under the applicable provisions of section 365 of the Bankruptcy Code." The parties have stipulated that RPD was not aware of the License until after all three sale motions and APAs were filed with the bankruptcy court, but that it

---

[4] There were ten related OnSite debtors in total.

became aware of the License before the bankruptcy court entered the last of the sale orders, the Waco sale order.

Shortly after the bankruptcy court approved the last of these sales, the trustees from the other estates—Provider Meds, LP ("Provider Meds"), OnSiteRx, Inc. ("OnSite"), and ProvideRx of San Antonio, LLC ("San Antonio")—entered into a settlement agreement, the "global agreement," with RPD and CERx, a competing secured party. The global agreement provided for RPD and CERx to severally own the OnSite source code, and divided other assets between them. RPD avers that because it was aware of the License at this point, it believed that it had purchased the License under the terms of the Grapevine, Western Pennsylvania, and Waco APAs and sale orders. As a result, the global agreement provided that the Provider Meds and San Antonio trustees would transfer their Tech Pharm licenses to CERx, but that "RPD is entitled to all remaining available Tech Pharm licenses (such as those otherwise acquired from ProvideRx of Grapevine, LLC; W Pa OnsiteRx, LLC; and ProvideRx of Waco, LLC)."

## C

Almost a year after the bankruptcy court approved the global agreement, Tech Pharm filed a petition in Texas state court against several defendants, including the Waco and San Antonio debtors, alleging that the defendants had failed to comply with their obligations under the License Agreement to provide quarterly reports and pay licensing fees for new machines. RPD intervened and removed the proceeding to the bankruptcy court, arguing that one or more of the debtor estates had assigned or otherwise transferred the License to RPD.

The bankruptcy court held that RPD did not have rights under the License Agreement for either of two reasons: RPD had not purchased the License under any of the OnSite sales and, regardless of the terms of the sales, the License Agreement was an executory contract that was rejected by

## No. 17-11113

operation of law prior to any alleged transfer.[5] It also determined that RPD had not gained rights under the License Agreement by purchasing OnSite machines from the debtors.[6] RPD appealed to the district court, which concluded that the License was a rejected executory contract and affirmed.[7]

RPD now appeals the decision of the district court affirming the bankruptcy court. It claims that its rights under the License Agreement were established by final and non-appealed bankruptcy court orders, so any determination to the contrary would constitute an impermissible collateral attack. It also argues that the bankruptcy and district courts erred on the merits in determining RPD has no rights under the License Agreement.

### D

In reviewing a decision of the district court affirming the bankruptcy court, we apply "the same standard of review to the bankruptcy court that the district court applied," reviewing findings of law *de novo* and findings of fact for clear error.[8] We conclude that the License Agreement was an executory contract that was deemed rejected by operation of law prior to the bankruptcy sales where RPD allegedly purchased the License. Because the License was not part of the bankruptcy estates at the time of the relevant sales, the bankruptcy court's final orders did not effect a transfer of the License from the OnSite debtors to RPD.

### II

Section 365 of Title 11 of the United States Code addresses the ability of bankruptcy trustees to assume or reject executory contracts and unexpired

---

[5] *See Tech Pharm. Servs., Inc. v. RPD Holdings, LLC* (*In re Provider Meds, LLC*), No. 13-30678, 2017 WL 213814, at \*10–11, 12–18 (Bankr. N.D. Tex. Jan. 18, 2017).

[6] *See id.* at \*11–12 ¶¶5–11.

[7] *Tech Pharm. Servs., Inc. v. RPD Holdings, LLC* (*In re Provider Meds, LLC*), No. 3:17-CV-0441-D, 2017 WL 3764630 (N.D. Tex. Aug. 31, 2017).

[8] *Galaz v. Katona* (*In re Galaz*), 841 F.3d 316, 321 (5th Cir. 2016).

No. 17-11113

leases. This provides a way for "a trustee to relieve the bankruptcy estate of burdensome agreements which have not been completely performed."[9] Once a trustee assumes an executory contract, a trustee may generally also assign the contract, even where legal or contractual provisions would otherwise prohibit assignment.[10] An executory contract must be assumed or rejected in its entirety,[11] and rejection may be treated as a breach of contract.[12]

Under most bankruptcy chapters, the trustee may assume or reject an executory contract at any point before the plan is confirmed,[13] but the rule is different for Chapter 7 cases. Section 365(d)(1) provides that in Chapter 7 cases,

> if the trustee does not assume or reject an executory contract or unexpired lease of residential real property or of personal property of the debtor within 60 days after the order for relief, or within such additional time as the court, for cause, within such 60-day period, fixes, then such contract or lease is deemed rejected.[14]

Here, if the License Agreement was an executory contract, the sixty-day time period started when the cases were converted to Chapter 7 and would have expired before the first of the bankruptcy sales.[15] The trustees did not assume the License Agreement within the required period. RPD contends that the bankruptcy and district courts erred in concluding that the License

---

[9] *Phoenix Exploration, Inc. v. Yaquinto* (*In re Murexco Petroleum, Inc.*), 15 F.3d 60, 62 (5th Cir. 1994) (per curiam).

[10] *See* 11 U.S.C. § 365(f)(1).

[11] *See Stewart Title Guar. Co. v. Old Republic Nat'l Title Ins. Co.*, 83 F.3d 735, 741 (5th Cir. 1996) (per curiam).

[12] 11 U.S.C. § 365(g).

[13] *See id.* § 365(d)(2); *Stumpf v. McGee* (*In re O'Connor*), 258 F.3d 392, 400 (5th Cir. 2001).

[14] 11 U.S.C. § 365(d)(1).

[15] As the bankruptcy court explained, the latest any of the trustees had to assume the License Agreement was November 3, 2013, but the earliest sale motion was filed on November 22, 2013. *See In re Provider Meds*, 2017 WL 213814, at *6 ¶ 49.

## No. 17-11113

Agreement was an executory contract. It further argues that even if the License Agreement is an executory contract, section 365(d)(1)'s time limit should not apply where the debtors failed to schedule the License and the trustees therefore were unaware of its existence. We disagree.

### A

Our first inquiry is whether the License Agreement was an executory contract. The Bankruptcy Code does not define the term "executory contract,"[16] but we have concluded that a contract is executory if "performance remains due to some extent on both sides" and if "at the time of the bankruptcy filing, the failure of either party to complete performance would constitute a material breach of the contract, thereby excusing the performance of the other party."[17] We must therefore determine whether both sides—Tech Pharm and each of the OnSite parties—owed additional performance under the License Agreement, and whether any party's failure to perform would constitute a material breach excusing the other side's performance.

The bankruptcy court held, and the district court affirmed, that Tech Pharm had an ongoing obligation under the License Agreement to refrain from suing its counterparties for patent infringement for machines placed into service after execution of the Agreement.[18] It further concluded that the OnSite

---

[16] *See In re Murexco Petroleum*, 15 F.3d at 62.

[17] *Id.* at 62–63; *accord Ocean Marine Servs. P'ship No. 1 v. Digicon, Inc.* (*In re Digicon, Inc.*), No. 03-20121, 2003 WL 21418127, at *5 (5th Cir. 2003) (per curiam) (approving of district court language adopting this definition). This follows the "Countryman" definition of an executory contract, which is widely—though not universally—adopted by our fellow circuits.

[18] *See In re Provider Meds*, 2017 WL 3764630, at *2 (district court opinion); *In re Provider Meds*, 2017 WL 213814, at *14–15 ¶¶ 22–26 (bankruptcy court opinion).

As we discuss, Tech Pharm dismissed its claims against the OnSite debtors with prejudice in the 2010 lawsuit, so it was already precluded from suing for patent infringement concerning machines in existence at the time of that lawsuit. The License Agreement separately provided that Tech Pharm would release the OnSite parties from claims "that relate to the [Patents] or any alleged infringement of same, except for the obligations specifically called for under this Agreement." We agree with the bankruptcy and district

No. 17-11113

licensees had ongoing material obligations because they were required to provide quarterly reports as to new machines, pay a one-time licensing fee of $4,000 to Tech Pharm for each new machine, and refrain from making public statements about the settled lawsuit.[19]

**1**

RPD does not dispute that these reciprocal requirements would typically be enough to render the License Agreement executory, but argues instead that unique features of the License Agreement make it non-executory. RPD's principal contention is that because the License Agreement came hand in hand with a settlement agreement to dismiss Tech Pharm's patent infringement suit against the OnSite debtors with prejudice, Tech Pharm's sole executory obligation under the License Agreement—to refrain from suing the OnSite debtors for patent infringement involving future machines—was illusory.

Claim preclusion "bars the litigation of claims that either have been litigated or should have been raised in an earlier suit."[20] Our analysis is most closely governed by principles of claim preclusion as they apply to patent infringement suits.[21] The Federal Circuit has held that claim preclusion does

---

courts that this contemplated an ongoing obligation not to sue the OnSite debtors for future patent infringement, even when such claims could not have been brought in the initial litigation. In other words, if Tech Pharm sued the OnSite parties for patent infringement even though they complied with the terms of the License Agreement, it would breach the contract.

[19] *In re Provider Meds*, 2017 WL 213814, at *16 ¶ 27.

[20] *Duffie v. United States*, 600 F.3d 362, 372 (5th Cir. 2010). "The test for claim preclusion has four elements: (1) the parties in the subsequent action are identical to, or in privity with, the parties in the prior action; (2) the judgment in the prior case was rendered by a court of competent jurisdiction; (3) there has been a final judgment on the merits; and (4) the same claim or cause of action is involved in both suits." *Id.*

[21] Because Federal Circuit law would govern any potential future patent infringement suit Tech Pharm could bring against the OnSite parties, we look to the Federal Circuit to see if principles of claim preclusion would bar a particular cause of action in a patent case. The Federal Circuit applies its own law on issues of claim preclusion specific to patent law. *See Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1298 (Fed. Cir. 2017); *see also SimpleAir, Inc. v. Google LLC*, 884 F.3d 1160, 1165–66 (Fed. Cir. 2018) (applying general

not bar patent infringement allegations "with respect to accused products that were not in existence at the time of the [previous actions,] for the simple reason that [claim preclusion] requires that in order for a particular claim to be barred, it is necessary that the claim either was asserted, or could have been asserted, in the prior action."[22] As a result, claim preclusion solely encompasses "the particular infringing acts or products that are accused in the first action or could have been made subject to that action."[23] This is consistent with the Supreme Court's decision in *Lawlor v. National Screen Service Corp.*, an antitrust case holding that even where two suits involved "essentially the same course of wrongful conduct," the later suit was not barred by claim preclusion because the prior judgment "[could] not be given the effect of extinguishing claims which did not even then exist and which could not possibly have been sued upon in the previous case."[24]

RPD argues that these general principles apply differently to method patent claims than to other claims for patent infringement. It contends that under a method patent, the determinative question is whether a particular process infringed on the method[25]—so once a claim for method patent infringement is dismissed with prejudice, any future challenge to the use of the same process is barred by claim preclusion. Under RPD's view, once Tech Pharm dismissed with prejudice its claim that the OnSite parties' process infringed its method patent, it could never again sue the OnSite parties for

---

Fifth Circuit principles of claim preclusion, but Federal Circuit law on whether "a particular cause of action in a patent case is the same as or different from another cause of action").

[22] *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1342 (Fed. Cir. 2012).

[23] *Id.* at 1343.

[24] 349 U.S. 322, 327–28 (1955); *see also Aspex Eyewear*, 672 F.3d at 1342–43 (citing *Lawlor*).

[25] *See Joy Techs., Inc. v. Flakt Inc.*, 6 F.3d 770, 773 (Fed. Cir. 1993).

using that same process, even if the OnSite parties used the process after the termination of the lawsuit to place new machines into operation.

We disagree, finding recent Federal Circuit case law conclusive on this point. *Mentor Graphics Corp. v. EVE-USA, Inc.* is particularly instructive.[26] There, the relevant parties had previously litigated two method and logic system patents,[27] but—as in this case—the patentholder dismissed its infringement claims with prejudice and granted a license to the asserted patents.[28] When another company acquired the licensee, the license automatically terminated.[29] The acquiring company then sued the patentholder for a declaratory judgment of non-infringement, and the patentholder counterclaimed for infringement.[30] The Federal Circuit flatly held that because the infringement claims were based on acts that occurred after the initial lawsuit, they were not precluded by the initial suit's dismissal with prejudice.[31] Following *Lawlor*, it emphasized that where infringement allegations could not have previously been brought in an initial suit because the alleged infringing act had not yet occurred, claim preclusion would not apply even where the alleged infringement was "essentially the same" as that litigated in the prior action.[32] Especially relevant here, the court observed that

---

[26] *Mentor Graphics*, 851 F.3d 1275.

[27] *See* U.S. Patent No. 6,009,531 (filed May 27, 1997); U.S. Patent No. 5,649,176 (filed Aug. 10, 1995).

[28] *Mentor Graphics*, 851 F.3d at 1297–98.

[29] *Id.* at 1298.

[30] *Id.*

[31] *Id.* at 1299.

[32] *Id.* at 1299–1301 ("The present lawsuit is based on post-license conduct, so the alleged infringement did not exist during the previous action . . . Because the allegations could not have been brought in the first action, we need not determine whether the newly accused products are 'essentially the same' as the products litigated in the first action.") (discussing *Lawlor v. Nat'l Screen Serv. Corp.*, 349 U.S. 322, 328 (1955); *Aspex Eyewear*, 672 F.3d at 1342; and *Brain Life, LLC v. Elekta Inc.*, 746 F.3d 1045, 1052 (Fed. Cir. 2014)).

In *Mentor Graphics*, the Federal Circuit also observed that under the Supreme Court's decision in *Kessler v. Eldred*, 206 U.S. 285 (1907), an adjudicated *non*-infringer may be

if such claims were instead barred by claim preclusion, "any licensee holding a license obtained through litigation could breach that license, yet prevent the patentee from asserting infringement against new products not covered by the license."[33] By holding that future infringement claims were not barred by claim preclusion, the *Mentor Graphics* decision avoided that counterintuitive result.

The Federal Circuit has reached similar results concerning other method patent claims. *Mentor Graphics* relied in part on the court's previous decision in *Brain Life, LLC v. Elekta Inc.*, which straightforwardly held that claim preclusion would not bar claims for method patent infringement "relating to acts of infringement that postdate [the prior] judgment" because the patentee could not have asserted claims in the first lawsuit for acts of infringement that occurred after the judgment in that suit.[34] Similarly, in *Asetek Danmark A/S v. CMI USA Inc.*, the Federal Circuit addressed an injunction predicated on a jury finding of liability for infringement of two system and method patents.[35] The patentholder dismissed with prejudice its claims against one of the defendants prior to trial,[36] but after the jury found liability, the district court enjoined both original defendants—including the dismissed party.[37] The court

---

shielded from future lawsuits involving the same allegedly infringing activity, even where such lawsuits would not be barred by claim or issue preclusion. *See Mentor Graphics*, 851 F.3d at 1301. While the *Kessler* doctrine may cushion the effect of these claim preclusion principles where a court conclusively establishes non-infringement, the *Mentor Graphics* panel explained that it does not apply where a party received a license to the patent and the patentholder dismissed its claims with prejudice, as is the case here. *See id.* at 1297–98, 1301.

[33] *Id.* at 1300.

[34] *Brain Life*, 746 F.3d at 1053–54.

[35] 852 F.3d 1352, 1355 (Fed. Cir. 2017). *Asetek Danmark* was initially decided prior to *Mentor Graphics*, and *Mentor Graphics* cited the initial opinion as one of several cases supporting its conclusion. *See Mentor Graphics*, 851 F.3d at 1299. The Federal Circuit subsequently vacated its original *Asetek Danmark* opinion and issued a new opinion, but its discussion of claim preclusion remained unchanged. *Compare Asetek Danmark A/S v. CMI USA Inc.*, 842 F.3d 1350, 1362–63 (Fed. Cir. 2016), *with Asetek Danmark*, 852 F.3d at 1365.

[36] *Asetek Danmark*, 852 F.3d at 1355.

[37] *Id.* at 1358.

concluded that the injunction against the dismissed party addressing its *future* conduct was not barred by claim preclusion, because "[i]t is well established . . . that the difference in timing means that the two situations do not involve the same 'claim' for claim-preclusion purposes, even if all the conduct is alleged to be unlawful for the same reason."[38] Although the court ultimately remanded for a more thorough determination of whether the injunction was permissible against the dismissed party,[39] it made clear that principles of claim preclusion standing alone would not have barred the injunction—even though the system and method infringement claims had previously been dismissed with prejudice.[40]

RPD's reliance on the Federal Circuit's earlier decision in *Hallco Manufacturing Co. v. Foster* is unpersuasive.[41] *Hallco* held that because a party had dismissed its patent invalidation claim with prejudice in earlier litigation, it was potentially barred from suing the patentholder to invalidate the same patent or from seeking a declaratory judgment that a redesigned device did not infringe the patent.[42] While *Hallco*'s language may be read more broadly, we take the Federal Circuit to have since clarified that the case does not govern preclusion of infringement claims brought *by the patentholder*, which were not at issue in *Hallco*.[43] The other cases we have discussed are more representative of whether claim preclusion would prevent Tech Pharm

---

[38] *Id* at 1365 (citing, e.g., *Aspex Eyewear*, 672 F.3d at 1343).

[39] *See id.* at 1368–69.

[40] *See id.* at 1370.

[41] 256 F.3d 1290 (Fed. Cir. 2001).

[42] *Id.* at 1293. The court remanded for a determination of whether the devices at issue were sufficiently different that principles of claim preclusion would not apply. *See id.* at 1298.

[43] *See Mentor Graphics*, 851 F.3d at 1299–1300 ("Neither [of the *Foster v. Hallco Manufacturing*] cases addressed whether a *patentee* could bring new *infringement* allegations based on conduct occurring after a previous litigation ended. This is the precise issue addressed in *Aspex Eyewear* and *Brain Life* and the precise issue now before us."). While the patentholder brought a counterclaim in the *Hallco* case, it was for breach of the settlement agreement, not for infringement. *See Hallco Mfg.*, 256 F.3d at 1293.

from suing the OnSite debtors over new machines—and they indicate that it would not.

In sum, but for the License Agreement, Tech Pharm would not be barred from suing the OnSite debtors for patent infringement stemming from their introduction of new OnSite machines—even if those machines used the same process at issue in the settled 2010 litigation. Tech Pharm had an ongoing material obligation under the License Agreement to refrain from suing the debtors.

**2**

The OnSite debtors also had corresponding material obligations under the License Agreement. The License Agreement straightforwardly obligated the debtors to take certain ongoing actions, such as filing quarterly reports and not discussing the settled lawsuit.[44] RPD claims, however, that because the License Agreement granted a "perpetual" license for so long as the Tech Pharm patent was valid and enforceable, Tech Pharm would be prohibited from suing the debtors for patent infringement even if they breached their side of the agreement—and so any debtor obligations would not be material, as required by our definition of an executory contract.[45] It points to cases holding that where a license is both "irrevocable" and "perpetual," the licensor may not revoke the license even when the licensee breaches.[46]

But the cases RPD cites do not stand for the proposition that a merely "perpetual" license is itself irrevocable in the face of material breach. Rather,

---

[44] We have suggested in an unpublished opinion that "[a] contract is not executory if the only performance required by one side is the payment of money." *In re Digicon, Inc.*, 2003 WL 21418127, at *5 (adopting language from district court opinion). Because the OnSite debtors were required to undertake other performance under the License Agreement, we do not need to resolve this issue here.

[45] *See In re Murexco Peroleum*, 15 F.3d at 62–63.

[46] *See Nano-Proprietary, Inc. v. Canon, Inc.*, 537 F.3d 394 (5th Cir. 2008); *Timeline, Inc. v. Proclarity Corp.*, No. C05-1013-JLR, 2007 WL 1574069 (W.D. Wash. May 29, 2007).

they hold that when a license uses the terms "irrevocable" and "perpetual," "irrevocable" must mean something beyond "not revocable at will," since otherwise the use of both "irrevocable" and "perpetual" would be superfluous.[47] Both cases explain that the use of "perpetual" indicates that the license may not be revoked at will; the use of "irrevocable" goes one step further and indicates that the license may not be revoked for any reason, even a breach by the other side.

RPD is arguably correct that because the License granted under the License Agreement was "perpetual," under Texas law, it was therefore not revocable at will.[48] This does not mean, though, that Tech Pharm would not be excused from its obligations if the OnSite debtors were to materially breach the License Agreement. RPD has offered no authority holding that a license that is *only* "perpetual," and not "perpetual and irrevocable," is irrevocable in the face of material breach—and, indeed, the cases it presents suggest the opposite.

---

[47] *See Nano-Proprietary*, 537 F.3d at 400 ("Based upon the unambiguous meaning of 'irrevocable,' we find that the PLA could not be terminated, notwithstanding a material breach of the agreement. Otherwise, the terms 'irrevocable' and 'perpetual' would be rendered superfluous, in contravention of established rules of contract interpretation."); *Timeline*, 2007 WL 1574069, at *4 ("Despite the ordinary meaning of the term, Timeline suggests that 'irrevocable' is used in the contract to convey that the licenses are not terminable at will and should not be interpreted to restrict Timeline's ability to terminate the licenses due to a material breach. As Microsoft notes, however, the licenses would not have been terminable at will even if the agreement had excluded the term 'irrevocable.' . . . As Microsoft suggests, the use of the word 'perpetual' would also be sufficient to express an intent that the licenses were not terminable at will.").

[48] Texas law "disfavors" perpetual contracts, but will typically treat a contract as perpetual—and therefore not revocable at will—if it offers a definite endpoint for the party's obligation. *See, e.g., Kirby Lake Dev., Ltd. v. Clear Lake City Water Auth.*, 320 S.W.3d 829, 842 (Tex. 2010). Here, indexing the License Agreement to the duration of the patent generated a definite endpoint. As we explain, however, we do not need to determine whether the License Agreement was in fact perpetual—even if it was perpetual, that still does not mean that it was irrevocable in the face of a material breach.

No. 17-11113

We therefore conclude that both sides had ongoing material obligations under the terms of the License Agreement, making it an executory contract. Having established that the License Agreement was executory, we must address whether it was rejected by operation of law.

## B

As we have explained, 11 U.S.C. section 365(d)(1) imposes a sixty-day deadline for a bankruptcy trustee to assume an executory contract, starting here with the cases' conversion from Chapter 11 to Chapter 7. After that deadline passes, the contract will be deemed rejected by operation of law. Because we have concluded that the License Agreement was executory, it appears that it was deemed rejected when each of the bankruptcy estates failed to assume it prior to the expiration of the sixty-day period. But RPD urges us to read an implicit exception into section 365(d)(1) for when a bankruptcy debtor fails to schedule the executory contract and the trustee was unaware of the contract within the sixty-day period.

Like most circuits, we have not spoken directly to this issue. Both parties point to the sparse array of applicable case law from other courts, though there appears to be no clear consensus. Some courts have held that a contract will not be deemed rejected by operation of law where a debtor intentionally conceals the existence of the contract from a trustee.[49] That is not at issue here, where the License Agreement was a matter of public record, listed on the docket of the 2010 patent litigation between Tech Pharm and the OnSite

---

[49] *See Strohbeck v. Zuniga* (*In re Zuniga*), 287 B.R. 201, 206 (Bankr. E.D. Mo. 2001) (finding an executory contract was not deemed rejected under § 365(d)(1) where the debtor had engaged in an overt pattern of misrepresentation about her bankruptcy in order to obtain a loan, and failed to disclose the loan contract to the trustee); *see also Texas W. Fin. Corp. v. McCraw Candies, Inc.*, 347 F. Supp. 445, 449 (N.D. Tex. 1972) (finding no rejection under an applicable provision of the Bankruptcy Act where "the transaction had been deleted from [the debtor's] business records and was not listed as an asset on the schedule . . . . [so there was no evidence] that the trustee had knowledge of the claim or could have obtained it").

debtors. When there is no intentional concealment, several courts have held that failure to schedule an executory contract will not prevent it from being deemed rejected,[50] though at least one court appears to have broadly concluded that failure to schedule the contract should always toll the deadline.[51]

While most of these decisions do not extensively discuss the issue, we find persuasive analysis in a Ninth Circuit decision addressing a similar provision under the earlier Bankruptcy Act.[52] That court held that under the Bankruptcy Act, "a trustee has an affirmative duty to investigate for unscheduled executory contracts or unexpired leases," and that "[t]he statutory presumption of rejection by the trustee's nonaction within the sixty day period following his qualification is a conclusive presumption."[53] The Ninth Circuit's decision took place in a different statutory landscape, but its reasoning still applies.[54] The Bankruptcy Code places an affirmative duty on the trustee to "investigate the financial affairs of the debtor."[55] And, more to the point, section 365(d)(1) does not impose an actual or constructive notice requirement

---

[50] *See Permacel Kansas City, Inc. v. Kohler Co.*, No. 08-00804-CV-W-FJG, 2010 WL 2516924, at *3-4 (W.D. Mo. June 14, 2010); *Carrico v. Tompkins* (*In re Tompkins*), 95 B.R. 722, 724 (B.A.P. 9th Cir. 1989); *Hoffman v. Vecchitto* (*In re Vecchitto*), 235 B.R. 231, 236 (Bankr. D. Conn. 1999), *aff'd*, No. 00-5010, 2000 WL 1508872 (2d Cir. Oct. 11, 2000).

[51] *See Medley v. Dish Network, LLC*, No. 8:16-CV-2534-T-36TBM, 2018 WL 4092120, at *5 (M.D. Fla. Aug. 27, 2018).

[52] *See Cheadle v. Appleatchee Riders Ass'n* (*In re Lovitt*), 757 F.2d 1035 (9th Cir. 1985) (discussing 11 U.S.C. § 110(b) (1970)).

[53] *Id.* at 1040–42.

[54] Cases decided under the modern Bankruptcy Code have looked to *In re Lovitt* approvingly. *See In re Tompkins*, 95 B.R. at 724; *Corp. Prop. Investors v. Chandel Enters.* (*In re Chandel Enters.*), 64 B.R. 607, 610 (Bankr. C.D. Cal. 1986). RPD argues that it is no longer applicable because it was decided under the Bankruptcy Act's rule that "executory contracts and leases—unlike all other assets—do not vest in the trustee as of the date of the filing of the bankruptcy petition . . . . [, but] only upon the trustee's timely and affirmative act of assumption." *In re Lovitt*, 757 F.2d at 1041. But we agree with Tech Pharm that the *Lovitt* conclusion regarding unscheduled contracts did not hinge on this presumption.

[55] 11 U.S.C. § 704(a)(4); *see also id.* § 704(a)(1) (requiring the trustee to "collect and reduce to money the property of the estate").

for when the sixty-day deadline applies. We will not read such a requirement into the statute when doing so is not supported by the statutory text.

Nor do we agree with RPD's other arguments for a narrower application of section 365(d)(1)'s deadline. There is no conflict with 11 U.S.C. sections 554(c) and (d), which provide that scheduled but non-administered property is abandoned to the debtor but property of the estate that is neither abandoned nor administered remains within the estate. The rejection of an executory contract places that contract outside of the bankruptcy estate[56]—so section 554 does not apply. Similarly, we disagree with RPD's suggestion that even where a contract has been rejected under section 365, a trustee can sell the contract pursuant to section 363. Because a rejected contract ceases to be property of the bankruptcy estate, it cannot be sold under a provision that authorizes a trustee to sell "property of the estate."[57] In any event, we cannot approve of the use of a "sale" under section 363 to avoid the requirement that an executory contract be assumed and assigned under section 365.[58]

---

[56] *See, e.g.*, *Eastover Bank for Savings v. Sowashee Venture* (*In re Austin Dev. Co.*), 19 F.3d 1077, 1081 (5th Cir. 1994) (observing that deemed rejection of a lease under § 365(d)(4) "did not terminate the lease but merely placed the trustee's obligation to perform under the leasehold outside of the bankruptcy administration without destroying the leasehold estate" (citing *Comm. Trading Co. v. Lansburgh* (*In re Garfinkle*), 577 F.2d 901, 904 (5th Cir. 1978)); *In re Scharp*, 463 B.R. 123, 129 (Bankr. C.D. Ill. 2011) ("The primary effect of rejection is to abandon the lease from the estate so that it reverts back to the debtor's control outside of bankruptcy. Assumption and rejection are bankruptcy concepts that determine whether the estate will administer the lease; rejection merely removes it from the property of the estate." (citations omitted)); *cf. Kane v. Nat'l Union Fire Ins. Co.*, 535 F.3d 380, 384–86 (5th Cir. 2008) (explaining that a trustee may abandon property of the estate, but may not administer property that was abandoned to the debtor pursuant to a different provision).

[57] *See* 11 U.S.C. § 363(b)–(c).

[58] *See Cinicola v. Scharffenberger*, 248 F.3d 110, 124 (3d Cir. 2001) ("[T]he sale of an executory contract triggers the protections afforded sales of bankruptcy estate property but also requires satisfaction of the requirements for assuming and/or assigning the same executory contract."); *In re Access Beyond Techs., Inc.*, 237 B.R. 32, 47 (D. Del. Bankr. 1999) ("A debtor cannot avoid the requirements of section 365 by saying it is 'selling' a lease or executory contract, rather than assuming and assigning it.").

No. 17-11113

We therefore hold that the License Agreement was deemed rejected by operation of law when each trustee failed to assume it within the sixty-day period. At a minimum, the statutory presumption of rejection after sixty days is conclusive where there is no suggestion that the debtor intentionally concealed a contract from the estate's trustee.[59]

## III

With this groundwork laid, that the bankruptcy court did not engage in an impermissible collateral attack on its previous orders becomes clear. RPD argues that two sets of final bankruptcy court orders established that it purchased the License Agreement from the Grapevine, Waco, and Western Pennsylvania estates.

The first were the sale orders from the Grapevine, Waco, and Western Pennsylvania estates. As we have explained, each of those sale orders ordered the transfer of the subject property defined in the relevant asset purchase agreement, and included a provision stating that to the extent that any of the transferred subject property was an executory contract, "the same [was] hereby ASSUMED by the Estate and immediately ASSIGNED to RPD under the applicable provisions of section 365 of the Bankruptcy Code." RPD argues that even if these provisions providing for assumption and assignment were erroneous, they are nonetheless entitled to protection against collateral attack.

But by the time each of these sale orders was finalized, the sixty-day deadline had passed for each estate, and the License Agreement had already been deemed rejected. As we have explained, when an executory contract is rejected, it exits the bankruptcy estate. It was therefore outside the power of the bankruptcy trustees to include the License Agreement within the subject

---

[59] We do not decide here whether this rule might shift if a debtor is shown to have hidden assets from a trustee.

property, or to attempt to assume and assign it to RPD. We do not read any of the bankruptcy court's sale orders as providing for the estates to assume and assign contracts that were outside the relevant estate at the time of sale.[60] This is not a matter of collateral attack, but merely an interpretation of the bankruptcy court's orders.[61]

RPD also points to the bankruptcy court's order effectuating the global agreement. It argues that the sale order explicitly incorporated all terms of the global agreement, including the portion of that agreement providing that "RPD is entitled to all remaining available Tech Pharm licenses (such as those otherwise acquired from ProvideRx of Grapevine, LLC; W Pa OnSiteRx, LLC; and ProvideRx of Waco, LLC)."[62] Standing alone, however, this could not conclusively establish that RPD had acquired the License through the Grapevine, Western Pennsylvania, and Waco sales. RPD did not actually purchase the License from any of those debtors—as an executory contract deemed rejected, it had already passed out of their estates—and the bankruptcy court's attenuated incorporation of a statement to the contrary does not establish otherwise.[63]

Ultimately, RPD's collateral attack argument hinges on the assumption that the License was still part of the bankruptcy estates at the time of each of

---

[60] Here, not only did the relevant sale orders not reference the License, but they also ordered the transfer of the subject property only to the extent that the debtor and estate had a right, title, or interest in the property. We cannot read the sale orders as ordering the License assumed and assigned even though it had already passed out of the relevant bankruptcy estates.

[61] *See United States v. 115.27 Acres of Land*, 471 F.2d 1287, 1290 (5th Cir. 1973).

[62] The bankruptcy court approved the global agreement in a sale order stating that "ALL terms of the Agreement are incorporated herein by reference."

[63] At a minimum, as Tech Pharm observes, only a Chapter 7 trustee may sell an estate's property, and so RPD and CERx could not by fiat establish that the Waco, Grapevine, and Western Pennsylvania trustees had transferred the license to RPD when those trustees were not parties to the global agreement. *See In re Gonzales*, No. 10-35766-SGJ-7, 2010 WL 4340936, at *2 (Bankr. N.D. Tex. Oct. 27, 2010).

the Grapevine, Western Pennsylvania, and Waco sales. It was not, and the bankruptcy court's sale orders did not hold differently. Our decision today therefore does not affirm a collateral attack on those sale orders.

\* \* \*

Because the License Agreement was an executory contract deemed rejected by operation of law, RPD could not and did not acquire the License from any of the Grapevine, Western Pennsylvania, and Waco estates—and no bankruptcy court order held otherwise. This resolves the heart of the dispute, so we do not need to resolve several other issues raised by the parties, such as whether RPD actually purchased the License under the terms of the relevant APAs and sale orders.

## IV

We pause to briefly address a final issue. The parties stipulated before the bankruptcy court that its scope of decision making would be limited to "whether [RPD] validly acquired, by way of sale and assignment, all rights and obligations under [the License Agreement]." At trial, RPD's counsel argued that even if RPD had not purchased or been assigned the License, it had a right to use the OnSite machines it had purchased from two of the debtor estates, under a provision of the License Agreement granting limited rights to third parties to operate OnSite machines.[64] When the bankruptcy judge observed that the issue had not been briefed and was not necessarily encompassed by the stipulated issues, RPD's counsel argued that the question was necessarily connected to whether RPD had acquired rights under the License Agreement.

---

[64] The relevant portion of the License Agreement provided that "If an Onsite Machine is used in a long-term care facility ('LTCF') as permitted by an Onsite party pursuant to this License, the Onsite party may sell the Onsite Machine to that LTCF or to a third party purchaser of the Onsite Machine who is not the LTCF. The LTCF (or a third party purchaser of the Onsite Machine who is not the LTCF) can continue to operate that Onsite Machine currently in place at the time of purchase of said Onsite Machine . . . ."

No. 17-11113

The bankruptcy court therefore assessed whether RPD had acquired limited rights under this provision, and concluded that it had not because it failed to prove that it had purchased specific machines encompassed by the License Agreement.[65] The court additionally concluded that under the terms of the License Agreement, RPD could only use any machines covered by the Agreement in the same long term care facility in which they were used at the time the Agreement was finalized, and that RPD had not shown that it had done so.[66] RPD now contends that this issue was not within the scope of the parties' stipulation or briefing, and that the bankruptcy court lacked jurisdiction to address it regardless; Tech Pharm responds that RPD raised the issue of its own volition, and should suffer the consequences.

Based on the facts presented to us, we conclude that the bankruptcy court did not exceed its authority in addressing RPD's rights through purchase of the OnSite machines. Nor do we find that the bankruptcy court erred in reading the License Agreement to require that third parties operate OnSite machines in the same locations where they were placed at the time of sale.

## V

We affirm the district court's judgment.

---

[65] *In re Provider Meds*, 2017 WL 213814, at \*11 ¶ 9. Specifically, the court noted that RPD had "failed to introduce evidence of the serial numbers of the 15 ADS Machines it purchased under the Grapevine APA and the Grapevine Sale Order," *id.*, and concluded the same regarding a machine purchased from the W. Pa. estate, *id.* at \*12 ¶ 10.

[66] *Id.* at \*11 ¶¶ 8–9.