[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-13841
_____

D. C. Docket No. 8:16-cv-02534-CEH-CPT


LINDA MEDLEY,

Plaintiff-Appellee,

versus

DISH NETWORK, LLC,

Defendant-Appellant.


_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(May 1, 2020)


Before JILL PRYOR and GRANT, Circuit Judges, and ROYAL,* District Judge.

_____

*Honorable C. Ashley Royal, Senior United States District Judge for the Middle District of
Georgia, sitting by designation.

ROYAL, District Judge:

This appeal raises issues related to consumer debt collection practices on debt Appellant Linda Medley contends was discharged in a voluntary Chapter 7 bankruptcy. Medley filed suit alleging Appellee DISH Network, LLC violated the Florida Consumer Collection Practices Act ("FCCPA") in its attempts to collect debt it knew had been discharged in bankruptcy and in its direct contacts with Medley knowing she was represented by counsel. In addition, Medley alleged DISH violated the Telephone Consumer Practices Act ("TCPA") by contacting Medley about the debt with an automated dialing system after she revoked her consent to receive such calls. The district court granted summary judgment in favor of DISH on all claims, and Medley appeals. After careful review and with the benefit of oral argument, we **AFFIRM** the district court on the TCPA claim and **REVERSE and REMAND** on the FCCPA claims.

## I.    BACKGROUND

Appellant Linda Medley entered into a 24-month Digital Home Advantage Plan Agreement (the "Agreement") with DISH to receive satellite television services in exchange for monthly payments. The Agreement included an option to participate in the DISH Pause program. For a $5.00 monthly fee, the Pause program allowed customers to temporarily suspend their satellite services and the charges for those services, for up to nine months during the term of the Agreement. Upon participation

in the Pause program, a customer's 24-month term commitment would be extended by the number of days she suspended her service.

As part of the Agreement, Medley provided her cellular telephone number and expressly authorized DISH "to contact [her] regarding [her] DISH Network account or to recover any unpaid portion of [her] obligation to DISH, through an automated or predictive dialing system or prerecorded messaging system."

Approximately eleven months into the two-year term of her contract, Medley called DISH to cancel her services. Upon learning the amount of early termination fees such cancellation incurred under the Agreement, however, she instead elected to participate in the DISH Pause program.

Approximately two months later, Medley, through her attorneys, filed a voluntary Chapter 7 bankruptcy petition in the United States Bankruptcy Court for the Middle District of Florida. Medley listed DISH TV and an amount of $831.74 on Schedule F, the schedule requiring petitioners to list outstanding debt to unsecured creditors. Medley did not list the Agreement on Schedule G, the schedule requiring petitioners to list all executory contracts and unexpired leases of real or personal property. Instead, she checked the box signifying she had no executory contracts and unexpired leases and signed the schedules.

Thereafter, the bankruptcy court entered its discharge order and discharged Medley's listed debts, including the $831.74 DISH amount that Medley listed on

3

Schedule F. DISH wrote off the $831.74 amount but continued to bill Medley the monthly $5.00 fee for the DISH Pause program. Medley did not pay these Pause fees.

Over a month after Medley's debts were discharged, DISH sent an email directly to Medley to collect the Pause fees. In response, Medley's counsel sent DISH the first of three facsimiles identifying Medley's DISH account and specifically notified DISH that the law firm of Leavengood, Dauval & Boyle represented Medley "with regard to her debts generally (i.e. for the purpose of settling ALL of her debts for filing a bankruptcy), including the above listed account and any other accounts of debts which you or your agency is attempting to collect from our client(s)." Subsequently, DISH sent four more emails directly to Medley seeking payment of the monthly Pause charges DISH continued to bill. In response, Medley's attorneys twice re-sent the same facsimile.

The facsimiles from Medley's attorneys also noted the TCPA's prohibition against making any call to their client using an automatic telephone dialing system ("ATDS") or an artificial or pre-recorded voice to a cellular phone without prior consent. The facsimiles expressly stated that "[t]o the extent any such prior express consent existed, if any, to call the above person using an ATDS, such consent is hereby forever revoked consistent with the Florida and federal law." DISH made six automated calls to Medley's cell phone after receiving the first fax.

4

When the DISH Pause feature expired, DISH removed it from Medley's account, restored her television services, and immediately disconnected her account for nonpayment of her DISH Pause charges. DISH then adjusted the new post-discharge charges to zero.

Medley filed suit in the Middle District of Florida raising claims under the FCCPA and the TCPA. Medley claimed DISH violated the FCCPA because DISH continued to contact her directly knowing she was represented by counsel about a debt it knew had been discharged in bankruptcy.[1] In addition, Medley claimed DISH violated the TCPA by using an ATDS or prerecorded voice to call Medley on her cell phone after Medley revoked her consent to receive such calls. The district court granted summary judgment in DISH's favor on all claims.

The district court characterized the Pause debt and the satellite services debt as separate debts, ultimately finding that the services debt was discharged, but the Pause debt was not. The court reasoned that the Agreement was an executory contract that was not deemed rejected under bankruptcy law because Medley failed to specifically list it on Schedule G of her bankruptcy schedules. Because the Agreement was not deemed rejected, the Pause charges that accrued after the petition was filed were post-petition debt that was not discharged in the bankruptcy.

---

[1] Medley also alleged harassment in violation of § 559.77(1) under the FCCPA, but she did not appeal that claim.

The district court relied on this threshold finding to grant DISH summary judgment on Medley's FCCPA claims. The court first found that DISH did not attempt to collect an illegitimate in debt in violation of FCCPA § 559.72(9) because DISH's alleged unlawful contact with Plaintiff concerned only the Pause debt that was not discharged. Likewise, the communications to DISH from Medley's attorneys stated that they represented Medley concerning the discharged services debt; DISH directly contacted Medley only about the non-discharged Pause debt; thus DISH did not violate FCCPA § 559.72(18)'s prohibition on directly contacting a debtor it knows to be represented by counsel. Finally, the district court found DISH's automated telephone calls did not violate the TCPA because the TCPA does not authorize unilateral revocation of consent to receive automated calls when such consent is given in a bargained-for contractual provision. Medley appeals.

## II.    ANALYSIS

We review a district court's grant of summary judgment *de novo*, "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party." *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).

## A. EFFECT OF THE BANKRUPTCY

Before addressing the FCCPA and TCPA claims on appeal, we must determine whether the district court erred in finding the Pause debt was not discharged in Medley's bankruptcy. We find it did. As explained herein, the Agreement was

deemed rejected as a matter of law under the Bankruptcy Code during Medley's bankruptcy; as a result, DISH had a prepetition breach of contract claim for the debt as a general unsecured creditor; that claim was discharged when the bankruptcy court entered the discharge order.

A fundamental objective of the Bankruptcy Code "is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, and enjoy a new opportunity in life with a clear field for future effort." *In re St. Laurent,* 991 F.2d 672, 680 (11th Cir. 1993) (internal quotations omitted). To accomplish this fresh start policy, the "Bankruptcy Code contains broad provisions for the discharge of debts, subject to" certain limited exceptions enumerated under 11 U.S.C. § 523(a). *Lamar, Archer & Cofrin v. Appling*, __ U.S. __, 138 S.Ct. 1752, 1758, 201 L.Ed.2d 102 (2018).

When a Chapter 7 debtor receives a discharge, she is discharged from all debts and "any liability on a claim" that arose, or are determined to arise, before the bankruptcy is filed. 11 U.S.C. § 727(b); *In re Mitchell*, 633 F.3d 1319, 1326 (11th Cir. 2011) (A discharge in bankruptcy discharges only those debts which are in existence at the time the petition in bankruptcy is filed.). A Chapter 7 discharge relieves the debtor of personal liability; it does not nullify a prepetition agreement or render any agreement unenforceable. *See e.g., Johnson v. Home State Bank*, 501 U.S. 78, 83, 111 S.Ct. 2150, 115 L.Ed.2d 66 (1991) (stating that a Chapter 7

discharge "extinguishes *only* 'the personal liability of the debtor'" and rejecting the argument that the underlying lien disappears with a discharge) (emphasis in original).

DISH's claim for the Pause debt is derived from the Agreement.  The Agreement provides:

> **Suspension of Service:** If you participate in DISH Pause or any other program that allows you to temporarily suspend your DISH service at any time during your term commitment, your term commitment will be extended by the number of days that your service is suspended. DISH will determine eligibility for participation and may deny eligibility for any reason.

The Agreement also specifies the Pause fee at $5.00 upon Medley's election to participate.

Both parties accept on appeal the district court's characterization of the Agreement as an executory contract.[2] Section 365 of the Bankruptcy Code governs executory contracts. 11 U.S.C. § 365(a). Under § 365, a trustee may assume or reject any executory contract of the debtor. In a Chapter 7 bankruptcy case, "if the trustee does not assume or reject an executory contract . . . of the debtor within 60 days after the order for relief . . . then such contract . . . is deemed rejected." *Id.* §365(d)(1). Here, it is undisputed that the trustee neither assumed nor rejected the Agreement.

---

[2] Although Medley questions the validity of the district court's characterization of the Agreement as executory and disputes that such characterization is even necessary to decide this case, she did not appeal such determination, and thus it is not an issue properly before this panel.

The district court held that the Agreement was not deemed rejected under § 365 because Medley failed to disclose it as an executory contract on Schedule G. We disagree.

Medley's failure to specifically list the Agreement as an executory contract on Schedule G does not prevent its deemed rejection. First, Medley disclosed DISH as an unsecured creditor on Schedule F. Thus, the trustee had notice of their relationship. Second, DISH clearly had notice of the bankruptcy and could have objected to the dischargeability of its breach of contract claim, but it did not do so. Finally, no evidence indicates Medley intentionally concealed the Agreement with DISH. *See In re the Matter of Provider Meds, LLC*, 907 F.3d 845, 858 (5th Cir. 2018) ("At a minimum, the statutory presumption of rejection after sixty days is conclusive where there is no suggestion that the debtor intentionally concealed a contract from the estate's trustee."). Because the trustee neither assumed nor rejected the Agreement, Medley disclosed her relationship with DISH on the petition, and no evidence indicates Medley attempted to conceal the Agreement from the trustee, we find the Agreement was deemed rejected pursuant to § 365(d)(1) of the Bankruptcy Code.

Rejection of a contract constitutes a breach of the contract immediately before the filing of the bankruptcy petition. 11 U.S.C. § 365(g)(1). Rejection does not dissolve or nullify the contract. *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294,

1306-1307 (11th Cir. 2007) ("[R]ejection does not embody the contract-vaporizing properties so commonly ascribed to it.... Rejection merely frees the estate from the obligation to perform; it does not make the contract disappear." (internal quotation marks and citation omitted)). Rejection results in a prepetition breach under the terms of § 365(g), and the non-debtor party's remedy is a claim for breach of contract. 11 U.S.C. § 365(g)(1); *Thompkins*, 476 F.3d at 1307. Thus, upon rejection of the Agreement, DISH had a prepetition breach of contract claim against Medley for the Pause debt.

DISH's claim, however, was discharged when the bankruptcy court entered the discharge order. As stated earlier, under § 727(b) of the Bankruptcy Code, a discharge in a Chapter 7 case "discharges the debtor from all debts" and "*any liability on a claim*" that arose or are determined to arise before the petition is filed. 11 U.S.C. § 727(b); *In re Edgeworth*, 993 F.2d 51, 53 (5th Cir. 1993) ("A discharge in bankruptcy does not extinguish the debt itself, but merely releases the debtor from personal liability for the debt."). Thus, DISH's prepetition breach of contract claim to recover the Pause debt was discharged in Medley's Chapter 7 bankruptcy case. Having determined that DISH's claim for the Pause debt was discharged, we now analyze the FCCPA and TCPA claims.

## B. FCCPA CLAIMS

Medley appeals the district court's rulings in favor of DISH on her FCCPA

10

claims under § 559.72(9) and § 559.72(18). FCCPA § 559.72(9) prohibits any person, in collecting consumer debts, from attempting to enforce a debt that person knows is not legitimate, or from asserting the existence of any other legal right who knows the right does not exist. Fla. Stat. § 559.72(9). FCCPA § 559.72(18) prohibits any person, in collecting consumer debts, to communicate with a debtor if that person knows that the debtor is represented by an attorney "with respect to such debt[.]" Fla. Stat. § 559.72(18). Medley contends that DISH violated FCCPA § 559.72(9) by attempting to collect debt it knew had been discharged in bankruptcy and violated § 559.72(18) by directly contacting her about such debt knowing she was represented by counsel.

The district court ruled in favor of DISH on both claims based on its threshold finding that the Pause debt had *not* been discharged in Medley's bankruptcy. As to Medley's § 559.72(9) claim, the court reasoned DISH properly attempted to collect the Pause debt because it had not been discharged. As to Medley's § 559.72(18) claim, the court found that although DISH knew Medley was represented by counsel with respect to the discharged services debt, it had no knowledge that Medley was represented by counsel with respect to the non-discharged Pause debt it was attempting to collect; thus, DISH's direct contacts were permissible. As we have previously explained, however, DISH's claim to the Pause debt *was* discharged in Medley's bankruptcy. As a result, the basis on which the district court granted

11

summary judgment is erroneous.

We agree with Medley that DISH attempted to collect debt it had no legal right to collect because the debt had been discharged in bankruptcy, and we agree that DISH directly contacted Medley after having received notice that she was represented by counsel. To hold a defendant liable, however, both statutes require a plaintiff to establish that the debt collector possessed actual knowledge. In addition, the FCCPA provides for a bona fide error defense. Fla. Stat. § 559.77(3). The district court did not address either. Thus, we remand this case to the district court to consider whether DISH actually knew that the Pause charges were invalid and that Medley was represented by counsel with regard to the debt it was attempting to collect, and if so, whether such errors were unintentional and the result of bona fide error.

## C. TCPA CLAIM

Finally, Medley appeals the district court's ruling in favor of DISH on her TCPA claim. The TCPA forbids "any person . . . to make any call (other than a call . . . made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice . . . to any telephone number assigned to a . . . cellular telephone service." 47 U.S.C. § 227(b)(1). The parties do not dispute that Medley expressly consented to be contacted by a prerecorded voice or ATDS in the Agreement. And there is no dispute that Medley

12

unilaterally attempted to revoke that consent via the faxes her attorneys sent to DISH, yet DISH continued to contact her. The question is whether the TCPA allows unilateral revocation of consent given in a bargained-for contract. The district court found that it does not, and we agree.

The district court followed the Second Circuit's reasoning in *Reyes v. Lincoln Auto. Fin. Servs.*, 861 F.3d 51, 56 (2nd Cir. 2017), the only Circuit to specifically address whether the TCPA allows a consumer to unilaterally revoke consent to receive automated calls when such consent is given as part of a bargained-for exchange. Like Medley, the plaintiff in *Reyes* expressly consented to receive automated telephone calls to collect a debt as part of a bilateral agreement and expressly revoked his consent to receive such calls. When the defendant continued to call, the plaintiff sued for violations of the TCPA. The Second Circuit affirmed summary judgment for the defendant, holding that "the TCPA does not permit a party who agrees to be contacted as part of a bargained-for exchange to unilaterally revoke that consent." *Id.* at 56. Acknowledging that the text of the TCPA is silent as to consent and "evidences no intent to deviate from common law rules defining 'consent,'" the Circuit applied the common law contract rules defining revocation of consent in legally-binding agreements. Under such rules, although consent given voluntarily and gratuitously is revocable under common law, consent given as a

mutually-agreed-upon term in a legally binding contract is not. *Id.* at 57-58 (citations omitted).

Like the district court, we agree with the Second Circuit. We have expressly stated that "an 'agreement is a manifestation of mutual assent on the part of two or more persons,' [and thus] it is black-letter contract law that one party to an agreement cannot, without the other party's consent, unilaterally modify the agreement once it has been executed." *Kuhne v. Fla. Dep't of Corrs.*, 745 F.3d 1091, 1096 (11th Cir. 2014) (quoting Restatement (Second) of Contracts § 3 (Am. Law Inst. 1981); (citing 17A Am. Jur. 2d Contracts § 500 (West database updated Dec. 2013))). As *Reyes* notes, this rule originates from the foundational "requirement that every provision of a contract—including any proposed modification—receive the 'mutual assent' of every contractual party in order to have legal effect." *Reyes*, 861 F.3d at 57 (citation omitted).

Medley argues such a determination is at odds with our decision in *Osorio v. State Farm Bank, F.S.B.*, 746 F.3d 1242 (11th Cir. 2014), with the Federal Communication Commission's ("FCC") 2015 Ruling, *In the Matter of Rules & Regulations Implementing the Tel. Consumer Prot. Act of 1991*, 30 F.C.C. Rcd. 7961, 7994-7999 (2015) (the "2015 FCC Ruling"), and with the consumer-protection purposes of the TCPA. We are unpersuaded. Contractual consent was not at issue in *Osorio* or the 2015 FCC Ruling. In *Osorio*, we addressed oral revocation

of consent when given gratuitously in a credit application. *Id.* at 1255. We acknowledged that the TCPA is silent "regarding the means of providing or revoking consent" and, like the Second Circuit, "presume[d] that Congress sought to incorporate 'the common law concept of consent.'" *Id.* (quoting *Gager v. Dell Fin. Servs., LLC*, 727 F.3d 265, 270 (3d Cir. 2013); citing *Neder v. United States*, 527 U.S. 1, 21, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Finding oral revocation generally permissible under common-law notions of consent, we held that the debtor could "orally revoke any consent previously given" to the creditor "in the absence of any contractual restriction to the contrary." *Id.* (internal quotation marks and citations omitted).

Likewise, the 2015 FCC Ruling did not address contractual consent. The FCC found that "the most reasonable interpretation of consent is to allow consumers to revoke consent if they decide they no longer wish to receive voice calls or texts." 2015 FCC Ruling, 30 F.C.C. Rcd. at 7993-94. The FCC stated that "an interpretation that would lock consumers into receiving unlimited, unwanted texts and voice calls is counter to the consumer-protection purposes of the TCPA and to common-law notions of consent." *Id.* at 7994. Neither *Osorio* nor the 2015 FCC Ruling addresses consent given in a legally binding agreement. Instead, *Osorio* and the FCC 2015 Ruling address consent given generally and rely on common law tort principles to find that consent is revocable under the TCPA. *See Osorio*, 746 F.3d at 1253 (citing

15

to RESTATEMENT (2D) OF TORTS); 2015 FCC Ruling, 30 F.C.C. Rcd. at 7994 n.223

(citing to the RESTATEMENT (2D) OF TORTS § 892A, cmt. i. (1979)). Here, however,

Medley gave consent as a mutually-agreed-upon term in a contract; therefore, we

must analyze revocation of consent under the common law principles governing

contracts. As discussed above, common law contract principles do not allow

unilateral revocation of consent when given as consideration in a bargained-for

agreement.

We, like the Second Circuit, are also unpersuaded by the argument that

unilateral revocation of consent given in a legally binding agreement is permissible

because it comports with the consumer-protection purposes of the TCPA. "It was

well-established at the time that Congress drafted the TCPA that consent becomes

irrevocable when it is integrated into a binding contract, and we find no indication

in the statute's text that Congress intended to deviate from this common-law

principle in its use of the word 'consent.'" *Reyes*, 861 F.3d at 58 (citing *Neder v.*

*United States,* 527 U.S. 1, 21, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999)). Permitting

Medley to unilaterally revoke a mutually-agreed-upon term in a contract would run

counter to black-letter contract law in effect at the time Congress enacted the TCPA.

"Absent express statutory language to the contrary, we cannot conclude that

Congress intended to alter the common law of contracts in this way." *Reyes*, 861

F.3d at 59 (citing *Neder,* 527 U.S. at 21–23, 119 S.Ct. 1827).

16

## CONCLUSION

For the foregoing reasons, the district court's order granting summary judgment to DISH is **AFFIRMED** as to the TCPA claim and **REVERSED AND REMANDED** as to the FCCPA claims.

GRANT, Circuit Judge, concurring:

I agree with both of the Court's principle conclusions. *First*, Medley's FCCPA claims should proceed because her Agreement with DISH was "deemed rejected" under 11 U.S.C. § 365(d)(1), meaning that she did not accrue new debt on the Agreement after bankruptcy. *Second*, Medley's TCPA claim fails because she could not unilaterally revoke the written Agreement's consent provision. I write separately to note that the Agreement's rejection (and the debt's discharge) may affect DISH's ability to contact Medley apart from her ability to withdraw consent. In short, although the Agreement's rejection did not nullify the consent provision, the subsequent discharge of Medley's debt may have taken DISH's actions outside the provision's scope.

At first blush, the consent provision's continuing ability to shield DISH from TCPA liability seems counterintuitive; the provision, after all, is part of a contract that was rejected in bankruptcy. But as the Court's opinion notes, rejection "does not dissolve or nullify the contract." Maj. Op. at 9 (citing *Thompkins v. Lil' Joe Records, Inc.*, 476 F.3d 1294, 1306–07 (11th Cir. 2007)). Rather, the Bankruptcy Code tells us that "the rejection of an executory contract . . . constitutes a breach of such contract." 11 U.S.C. § 365(g).

Because debtors typically emerge from Chapter 7 bankruptcies with a fresh start, it is tempting to think of rejection as a process by which the debtor is entirely

18

relieved of her contractual obligations.  It is important, though, to distinguish between rejection and discharge.  *Rejection* is about whether the estate, as opposed to the debtor, will undertake the obligations of an executory contract.  But rejection does not free the debtor of any obligation.  Rather, it "merely frees *the estate* from the obligation to perform."  Maj. Op. at 10 (quoting *Thompkins*, 476 F.3d at 1306) (emphasis added); *see also* Michael T. Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection,"* 59 U. Colo. L. Rev. 845, 848 (1988).  So the financial obligation is no more, but the debtor may retain other obligations or agreements depending on what else is contained in the rejected contract.

Here, when the Chapter 7 trustee failed to assume the Agreement within 60 days, it was rejected by operation of law.  The bankruptcy court's order on August 26, 2014, then discharged Medley "from all debts that arose before the date of the order for relief."  11 U.S.C. § 727(b).  This included Medley's debt to DISH.  "A Chapter 7 discharge relieves the debtor of personal liability; it does not nullify a prepetition agreement or render any agreement unenforceable."  Maj. Op. at 7 (citing *Johnson v. Home State Bank*, 501 U.S. 78, 83 (1991)).  Medley's consent to be contacted by DISH is not a personal liability of Medley, so the consent provision might appear to be no more affected by the discharge order than by the Agreement's rejection.

19

But here is the reason that I write: the consent provision did not grant DISH an unrestricted right to contact Medley for any reason, for eternity. Medley only authorized DISH "to contact [her] regarding [her] DISH Network account or to recover any unpaid portion of [her] obligation to DISH, through an automated or predictive dialing system or prerecorded messaging system." After the Agreement was rejected, the entirety of Medley's account with DISH was her outstanding obligation for unpaid fees and early termination. And after Medley's personal liability was discharged, she did not have *any* obligation to DISH, let alone an unpaid obligation. That may mean that under the terms of the contract DISH was not permitted to call her.

*    *    *

The parties assumed that the critical question was whether Medley could unilaterally revoke her consent, and the Court correctly says no. But this correct holding—that rejection of a contract is not the same as dissolution of a contract— need not invite phantom obligations that can never dissipate. In my view, the parties ignored the logical follow-on question: whether, given the discharge of Medley's debt, DISH's phone calls were permitted by the consent provision. Had Medley raised this argument, it is not clear how we would have resolved it; that would require answering several unbriefed questions of both statutory and contractual interpretation. It may well be that because Medley no longer had any

20

debt, the phone calls were not permitted. Or it could be that DISH had some kind of TCPA or contractual defense against liability for a good-faith error. But the parties did not gather evidence on these issues or brief them, and I see no reason to depart from the general rule that we do not resolve legal issues unless they are properly raised by the parties. *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1330 (11th Cir. 2004) (to evaluate an argument that has not been presented "would undermine the very adversarial nature of our appellate system"); *see also Singleton v. Wulff*, 428 U.S. 106, 120 (1976) (federal appellate courts do not generally resolve issues not considered below). Still, it is important to note that the analysis need not always end where the parties left it here.